UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMES LUE MOUA,<br><br>　　　　　　Plaintiff,<br><br>　　v.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>　　　　　　Defendant. | Case No. 1:20-cv-01230-BAK<br><br>FINAL JUDGMENT AND ORDER REGARDING PLAINTIFF'S SOCIAL SECURITY COMPLAINT<br><br>(ECF Nos. 20, 21) |

　　　　This matter is before the Court on Plaintiff James Lee Moua's ("Plaintiff") complaint for judicial review of an unfavorable decision by the Commissioner of the Social Security Administration. (ECF No. 1). The parties have consented to entry of final judgment by the United States Magistrate Judge under the provisions of 28 U.S.C. § 636(c) with any appeal to the Court of Appeals for the Ninth Circuit. (ECF No. 11).

　　　　Plaintiff challenges the decision of the Administrative Law Judge ("ALJ") on the following grounds:

　　A. The ALJ committed harmful error by failing to find Mr. Moua's psychological and physical MDI impairments, singularly or in combination, "more than minimally" interfere with this ability to sustain work activity, and ending the disability inquiry at step Two.

1

1. The ALJ committed harmful error by failing to find Mr. Moua's MDI of Major Depressive Disorder more than minimally interferes with his ability to sustain work activity at step Two.

2. The ALJ committed harmful error by failing to give "specific and legitimate" reasons for rejecting the only psychological MSS from treating source, Dr. Mouanoutoua.

3. The "New and Material" MSS Evidence submitted to the Appeals Council (AC) would change the outcome of the decision.

4. The ALJ committed harmful error by failing to find Mr. Moua's physical MDI's of Vision Loss, Hearing Loss and OSA "more than minimally" interfered with his ability to perform wo[r]k activity, and ending the disability inquiry at step Two.

Having reviewed the record, administrative transcript, the briefs of the parties, and the applicable law, the Court finds as follows:

**I.     ANALYSIS**

   **A.     Legal Standards Regarding Step Two Finding**

The ALJ found that "[t]he claimant does not have an impairment or combination of impairments that has significantly limited (or is expected to significantly limit) the ability to perform basic work-related activities for 12 consecutive months; therefore, the claimant does not have a severe impairment or combination of impairments."  (A.R. 22).

If a claimant has a medically determinable impairment ("MDI"), the ALJ must determine "whether your impairment(s) is severe," which is referred to as Step Two. 20 C.F.R. § 404.1521. A "severe" impairment is "any impairment or combination of impairments which significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). The "ability to do basic work activities," in turn, is defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. 404.1522(b). "An impairment is not severe if it is merely 'a slight abnormality (or combination of slight abnormalities) that has no more than a minimal effect on the ability to do basic work activities.'" *Webb v. Barnhart*, 433 F.3d 683, 686 (9th Cir. 2005) (quoting S.S.R. 96-3(p) (1996)).

The Ninth Circuit has provided the following guidance regarding whether medically determinable impairments are severe under Step Two:

> An impairment or combination of impairments may be found "not severe *only if* the evidence establishes a slight abnormality that has no more than a minimal effect on an individual's ability to work." [*Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996)] (internal quotation marks omitted) (emphasis added); *see Yuckert v. Bowen,* 841 F.2d 303, 306 (9th Cir. 1988). The Commissioner has stated that "[i]f an adjudicator is unable to determine clearly the effect of an impairment or combination of impairments on the individual's ability to do basic work activities, the sequential evaluation should not end with the not severe evaluation step." S.S.R. No. 85–28 (1985). Step two, then, is "a de minimis screening device [used] to dispose of groundless claims," *Smolen,* 80 F.3d at 1290, and an ALJ may find that a claimant lacks a medically severe impairment or combination of impairments only when his conclusion is "clearly established by medical evidence." S.S.R. 85–28. Thus, applying our normal standard of review to the requirements of step two, we must determine whether the ALJ had substantial evidence to find that the medical evidence clearly established that Webb did not have a medically severe impairment or combination of impairments. *See also Yuckert,* 841 F.2d at 306 ("Despite the deference usually accorded to the Secretary's application of regulations, numerous appellate courts have imposed a narrow construction upon the severity regulation applied here.").

*Id. at* 686–687. Additionally, the Supreme Court has stated, "The severity regulation increases the efficiency and reliability of the evaluation process by identifying at an early stage those claimants whose medical impairments are so slight that it is unlikely they would be found to be disabled even if their age, education, and experience were taken into account." *Bowen v. Yuckert,* 482 U.S. 137, 153 (1987).

Plaintiff also cites to an Arizona district court case for the proposition that, even if an ALJ's decision finding no severe impairment at Step Two of the sequential evaluation is supported by substantial evidence, it is reversible error if there is "objective evidence" suggesting more than de minimis evidence of a severe impairment. (ECF No. 20, at p. 16), citing *Young v. Colvin* (D. Ariz., Feb. 21, 2017, No. CV-16-02264-PHX-DGC) 2017 WL 677167, at *4 ("The Court also concludes that the holding of *Webb*, as opposed to its statement of the standard, requires the Court to reverse if objective evidence suggests that Plaintiff's impairments are more

than de minimis. *Webb*, 433 F.3d at 687. Because such objective evidence exists in this case—Plaintiff's undisputed diagnoses, his repeated hospitalizations, and his suicidal and self-destructive behaviors—the Court will reverse the ALJ's decision.").[1]

### B. Major Depressive Disorder

Plaintiff first challenges the ALJ's determination that Plaintiff's MDI of Depression was not severe. The ALJ provided the following reason in support of that finding:

> In regards to the claimant's mental impairments, records reflect intermittent reports of depression, stress, and anxiety prior to 2019, but the reports are generally intermittent with minimal corroborating objective evidence (Ex. 4F/46, 16F, *et al.*). While the claimant's treatment for mental health impairments is limited prior 2019, he did undergo a psychological consultative evaluation in December 2017 (Ex. 9F). R. Yadegar, PhD, a consultative examining psychologist completed the evaluation. It is worth noting that the claimant drove himself to the examination. As for his current symptoms, the claimant "stated that he has no mental health problems." He further asserted that he had never taken psychiatric medications or undergone any form of mental health treatment. As for his activities of daily living, work history, and family history, the claimant noted that he was currently living with his wife. He reported that he had a master's degree in general education courses. He was no longer working as he was retired. The claimant indicated that he was able to tend to his personal care needs independently, prepare simple meals, do dishes, go shopping once per week, do yardwork once per week, drive, vacuum, mop, use his computer daily, do laundry twice per month, and watch television. The claimant did assert that he had become short-tempered towards the end of his last job due to a significant increase in stress, but he denied suicidal or homicidal ideations.
>
> As for Dr. Yadegar's objective examination findings, the claimant was appropriately dressed and groomed (Ex. 9F). He was able to make good eye contact and was cooperative with all questioning. Dr. Yadegar generally described the claimant as pleasant. The claimant's speech was within average range and his

---

[1] Plaintiff also cites to another Arizona district court case in support of this proposition, but the Court there merely applied the legal standards from the Ninth Circuit, cited above. (ECF No. 20, at p. 17), citing *Robinson v. Commissioner of Social Security Administration,* 2019 WL 4667979, at *5 (D. Ariz., Sept. 25, 2019) ("The evidence shows that Plaintiff suffers from an impairment that can be considered severe within the meaning of the Act and its regulations. However, because the ALJ ended the inquiry at step two, the record is underdeveloped with respect to Plaintiff's ability (or inability) to sustain work in the national economy.").

thought process was clear, goal oriented, and purposeful. He did not exhibit signs of accelerated speech and his communication was effective. The claimant denied hallucinations, delusions, distortions, and preoccupations. In regards to his mood, the claimant indicated that he was "feeling okay," but he did acknowledge some variable depression. The claimant also noted that he would like to "feel happy again." The claimant reported that he generally slept six to seven hours per night. He did not report significant sleep disturbances. He did report having "no appetite." While the claimant only reported intermittent depression and noted that he was feeling okay at the time of the examination, he rated his depression as six on a scale of one to 10 with 10 being the most severe depression. The claimant's rating seems to conflict with other reports he made during the evaluation. Turning to the intellectual functioning portion of the examination, the claimant did demonstrate some abstract thinking difficulties, but his estimated level of intelligence was in the average range. He was able to perform calculations, his insight/judgment and similarities/differences were intact, and he did not demonstrate significant concentration abnormalities. On the memory examination, the claimant was only able to remember one item after a five-minute delay, but after another five minutes, he was able to remember three objects.

The claimant did eventually begin therapy in 2019 (Ex. 19F). Vang Leng Mouanoutoua, PhD, asserted that he began treating the claimant on April 11, 2019 (*see* Ex. 12F). The records do show the claimant underwent treatment at GVHC Merced Suites, the facility where Dr. Mouanoutoua works, on April 11, 2019, but the appointment was related to physical impairments and was conducted by another medical provider (Ex. 11F/1-3). The first episode of documented treatment with Dr. Mouanoutoua occurred on May 15, 2019 (Ex. 19F/35-39). During the examination, the claimant reported that he experienced chronic depression that affects his interest and energy level. He also reported social stresses, fatigue, and generalized sadness. Dr. Mouanoutoua diagnosed the claimant with major depressive disorder and generalized anxiety disorder. While the records document many of the claimant's subjective complaints, Dr. Mouanoutoua did not include a mental status examination and the objective findings are minimal at best. The claimant continued to see Dr. Mouanoutoua on a monthly basis (Ex. 19F/8-20, 26-29). The claimant continued to report depression, sadness, and other symptoms over this period. He did appear sad, withdrawn, and depressed at times during the examinations, but the objective findings remained minimal. He did receive a prescription for Zoloft on July 11, 2019 (Ex. 19F/21-25). In September 2019, Dr. Mouanoutoua noted that the claimant still asserted that his depression was impacting his socializing and caused ruminating thoughts (Ex. 19F/8-11). Dr. Mouanoutoua further noted that the claimant continued to appear "down, sad, and depressed," but the claimant was "engaged and responded properly to encouragements and feed backs from counseling." Otherwise, Dr. Mouanoutoua did not include objective findings. Another medical provider noted that the claimant exhibited an improved mood in October 2019, but since his responses to the Patient Health Questionnaire (PHQ-9) continued to suggest moderate to severe depression, the treating physician

increased the claimant's Zoloft dosage (Ex. 20F). While the evidence of record suggests some increased mental health symptoms in 2019, the symptoms have not been present for a continuous 12-month period and the claimant's positive response to medication and engagement in therapy suggests they may not be present for a continuous 12 months. Given the absence of mental health treatment prior to 2019, the claimant's reports and performance during the consultative examination, and the short duration of the claimant's symptoms in 2019, the undersigned finds the evidence does not support the presence of severe mental impairments.

Overall, the records show the claimant was able to perform substantial gainful activity for an extended period despite his physical and mental impairments. Moreover, the evidence of record does not reflect significant changes in the claimant's impairments that would account for the claimant's assertion that his impairments progressed to a level where he was no longer able to work by September 22, 2017. Given these factors, the undersigned finds the claimant's physical and mental impairments do not reach a severe level singly or in combination.

The undersigned finds the medical opinion of Dr. Yadergar, the consultative examining physician who opined the claimant did not have severe functional limitations, is persuasive (Ex. 9F). The limited abnormalities detailed in Dr. Yadergar's objective examination findings support his conclusions. Moreover, his opinion is consistent with the absence of mental health treatment from the alleged onset date into 2019, the claimant's positive response to medication, and the record as a whole.

The undersigned finds the medical opinion of Dr. Mouanoutoua is not persuasive (Ex. 12F). Dr. Mouanoutoua[] asserted that the claimant's mental impairments would preclude the claimant from performing many activities for at least 72 minutes per day and cause him to be absent at least five days per month. He further asserted that these limitations dated back to 2016. The undersigned finds Dr. Mouanoutoua's opinion is not supported by his treatment notes, which show he his treatment history with the claimant does not date back to 2016 and contain limited objective findings. Moreover, his opinion is inconsistent with the fact that the claimant did engage in full-time work until late 2017, the claimant's limited reports of stress, the absence of mental health treatment prior to 2019, and the claimant's positive response to medication.

The undersigned finds the medical opinions of Margaret Pollack, PhD, and Barbara Moura, PysD, two State Agency reviewing mental health professionals who found the claimant's mental impairments are nonsevere, are persuasive (Ex. 1A & 3A). While the mental health providers included minimal explanations to support their opinions, their opinions are consistent with the claimant's lack of mental health treatments, the limited subjective complaints prior to 2019, his positive response to medication, and the record as a whole.

> . . . .
>
> Because the claimant has a medically determinable mental impairment, the undersigned has considered the four broad functional areas, set out in the disability regulations for evaluating mental disorders and in section 12.00C of the Listing of Impairments (20 CFR, Part 404, Subpart P, Appendix 1). These four broad functional areas are known as the "paragraph B" criteria.
>
> The first functional area is understanding, remembering or applying information. In this area, the claimant has no limitation. The claimant did not allege any limitations in memory, understanding, or his ability to follow instructions on his Function Report (Ex. 4E). Moreover, the consultative examination findings do not reflect significant deficits in memory.
>
> The next functional area is interacting with others. In this area, the claimant has no limitation. The 2019 therapy notes do contain references to social stressors and difficulties interacting with others (see Ex. 19F), but the claimant did not report difficulties interacting with others in his Function Report (Ex. 4E). Moreover, the records generally show the claimant interacted well with medical providers. Therefore, the evidence of record does not support the presence of social limitation.
>
> The third functional area is concentrating, persisting or maintaining pace. In this area, the claimant has no limitation. The claimant did not report concentration, focus, or persistence limitations in his Function Report and he performed well on the concentration portion of his consultative examination (Ex. 4E & 9F). These factors combined with the limited abnormalities detailed in the treatment notes support finding the claimant does not have limitations in the area of concentrating, persisting, or maintaining pace.
>
> The fourth functional area is adapting or managing oneself. In this area, the claimant has no limitation. During the consultative examination, the claimant reported that he was able to tend to his personal care needs, complete household chores and yard work, drive, and perform other routine tasks. While the 2019 records do contain some reports of difficulty with activities of daily living, the claimant's continuing response to medication suggests these subjective complaints may not persist a full 12 months. Given these factors, the undersigned finds the claimant does not have limitations in adapting or managing oneself.
>
> Because the claimant's medically determinable mental impairment causes no more than "mild" limitation in any of the functional areas <u>and</u> the evidence does not otherwise indicate that there is more than a minimal limitation in the claimant's ability to do basic work activities, it is nonsevere (20 CFR 404.1520a(d)(1)).

(A.R. 25-28).

The Court finds that these reasons are supported by substantial evidence. As the ALJ noted, the consultative psychologist's evaluation by Dr. Yadegar from December 2017 noted that "[t]he claimant stated he has no mental health problems. He is applying for SSI for vision and hearing. . . . The claimant stated [] that he started feeling very stressed at work and he had to leave the job because of having a very strict and demanding supervisor, but he does not believe that he has any mental health problems. . . . he believes that this is all related to the stressful job that he had to walk away from." (A.R. 349-50). Although the examination revealed depressive thoughts, such as Plaintiff stating, "I have nothing that brings me pleasure," the psychologist concluded, "The claimant's problems appear to be treatable. The likelihood of recovery is good. It is very likely that the claimant's condition will improve within the next 12 months with appropriate intervention from mental health treatment and psychiatric medication evaluation." (A.R. 351-52). The psychologist also found either no or mild impairments in the functional assessment. (A.R. 352). The ALJ properly cited to this opinion, including its objective examination findings.

The ALJ also relied on the medical opinions of Drs. Pollack and Moura, State Agency reviewing mental health professionals, who found the Plaintiff's mental impairments to be nonsevere. (A.R. 27);*(see* A.R. 54 ("MSS: The claimant is capable of managing his own funds. The claimant's ability to perform simple and repetitive tasks is unimpaired. The claimant's ability to perform detailed and complex tasks is unimpaired. The claimant's ability to accept instructions from supervisors is unimpaired. The claimant's ability to interact with coworkers and the public is unimpaired. The claimant's ability to perform work activities on a consistent basis without special or additional instruction is mildly impaired. The claimant's ability to maintain regular attendance and complete a normal workday/workweek without interruptions from a psychiatric condition is mildly impaired. The claimant's ability to deal with the usual stress encountered in the workplace is unimpaired.")).

The ALJ also properly cited to Plaintiff's Function Report. (A.R. 28, citing Exh. 4E). In

that report, Plaintiff only cited his vision and hearing problems as conditions that limited his ability to work. (A.R. 186);(*see also* A.R. 188 ("No other injuries/illness, only vision and hearing.")).

The ALJ also cited and evaluated contrary statements from the Plaintiff and Dr. Mouanoutoua, discussed further below. However, neither Plaintiff's statements nor the physician's opinion included clear objective medical evidence of a nonsevere impairment. Instead, they consist of Plaintiff's descriptions of depressed thoughts and feelings and description of frustration and stress from being reprimanded multiple times at work. The ALJ properly noted this lack of objective findings.

Upon review of the ALJ's opinion and underlying evidence, the Court finds that the ALJ's opinion that Plaintiff's MDI of Depression was not severe is supported by substantial evidence.

### C.  Opinion of Treating Physician, Dr. Mouanoutoua

Plaintiff next argues that the ALJ erred in rejecting the opinion from the treating source, Dr. Mouanoutoua.

This appeal is governed by the Social Security Administration's ("SSA") new rules regarding the treatment of physician opinions because the claims were filed on October 6, 2017. Those new regulations state the Commissioner "will not defer or give any specific evidentiary, including controlling weight, to any medical opinion(s)." Revisions to Rules Regarding the Evaluation of Medical Evidence, 2017 WL 168819, 82 Fed. Reg. 5844, at 5867-68 (Jan. 18, 2017); *see also* 20 C.F.R. §§ 404.1520c(a), 416.920c(a). Instead, the Commissioner must consider all medical opinions and "evaluate [their] persuasiveness" based on supportability, consistency, relationship with the claimant, specialization, and other factors. 20 C.F.R. §§ 404.1520c(c); 416.920c(c). The most important factors are supportability and consistency. 20 C.F.R. §§ 404.1520c(a), (b)(2); 416.920c(a), (b)(2).

Although the regulations eliminate the "physician hierarchy," deference to specific medical opinions, and assigning "weight" to a medical opinion, the ALJ must still "articulate how [he or she] considered the medical opinions" and "how persuasive [he or she] find[s] all of the

medical opinions." 20 C.F.R. §§ 404.1520c(a), (b)(1); 416.920c(a), (b)(1). The ALJ is specifically required to "explain how [he or she] considered the supportability and consistency factors" for a medical opinion. 20 C.F.R. §§ 404.1520c(b)(2); 416.920c(b)(2) ("Therefore, we will explain how we considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in your determination or decision.").

The Ninth Circuit has not yet had the opportunity to address the impact of the new regulations on the requirement that the ALJ provide "clear and convincing" reasons for rejecting an uncontradicted physician's opinion and "specific and legitimate reasons" for rejecting a contracted physician's opinion. *Lester v. Chater*, 81 F.3d 821, 830–31 (9th Cir. 1995). However, several district courts have given the opinion that these articulation standards still apply. *See, e.g., Stephanie B. v. Commissioner of Social Security* (W.D. Wash., Jan. 7, 2022, No. 2:21-CV-462-DWC) 2022 WL 72062, at *2–3 ("Thus, while the new regulations ask the ALJ to explain, at a minimum, how the ALJ considered the supportability and consistency factors of a medical opinion, if the medical opinion is uncontradicted the ALJ must still cite 'clear and convincing' reasons for rejecting it, and if it is contradicted, the ALJ must still give 'specific and legitimate' reasons for rejecting it."); *see also Kathleen G. v. Comm'r of Soc. Sec.*, No. C20-461 RSM, 2020 WL 6581012 at *3 (W.D. Wash. Nov. 10, 2020) (finding that the new regulations do not clearly supersede the "specific and legitimate" standard because the "specific and legitimate" standard refers not to how an ALJ should weigh or evaluate opinions, but rather the standard by which the Court evaluates whether the ALJ has reasonably articulated his or her consideration of the evidence); *Morgan v. Saul,* 2020 WL 11723490, at *5 (C.D. Cal., Oct. 21, 2020) ("[T]he ALJ was obliged under both existing case law and the new regulations to explain, at a minimum, with specific and legitimate reasons, his conclusion that Dr. DePriest's opinion was not supported by the objective medical evidence").

As quoted above, the ALJ found the opinion of Dr. Mouanoutoua to be not persuasive. In particular, the ALJ stated:

The claimant did eventually begin therapy in 2019 (Ex. 19F). Vang Leng Mouanoutoua, PhD, asserted that he began treating the claimant on April 11, 2019 (*see* Ex. 12F). The records do show the claimant underwent treatment at GVHC Merced Suites, the facility where Dr. Mouanoutoua works, on April 11, 2019, but the appointment was related to physical impairments and was conducted by another medical provider (Ex. 11F/1-3). The first episode of documented treatment with Dr. Mouanoutoua occurred on May 15, 2019 (Ex. 19F/35-39). During the examination, the claimant reported that he experienced chronic depression that affects his interest and energy level. He also reported social stresses, fatigue, and generalized sadness. Dr. Mouanoutoua diagnosed the claimant with major depressive disorder and generalized anxiety disorder. While the records document many of the claimant's subjective complaints, Dr. Mouanoutoua did not include a mental status examination and the objective findings are minimal at best. The claimant continued to see Dr. Mouanoutoua on a monthly basis (Ex. 19F/8-20, 26-29). The claimant continued to report depression, sadness, and other symptoms over this period.

He did appear sad, withdrawn, and depressed at times during the examinations, but the objective findings remained minimal. He did receive a prescription for Zoloft on July 11, 2019 (Ex. 19F/21-25). In September 2019, Dr. Mouanoutoua noted that the claimant still asserted that his depression was impacting his socializing and caused ruminating thoughts (Ex. 19F/8-11). Dr. Mouanoutoua further noted that the claimant continued to appear "down, sad, and depressed," but the claimant was "engaged and responded properly to encouragements and feed backs from counseling." Otherwise, Dr. Mouanoutoua did not include objective findings. Another medical provider noted that the claimant exhibited an improved mood in October 2019, but since his responses to the Patient Health Questionnaire (PHQ-9) continued to suggest moderate to severe depression, the treating physician increased the claimant's Zoloft dosage (Ex. 20F). While the evidence of record suggests some increased mental health symptoms in 2019, the symptoms have not been present for a continuous 12-month period and the claimant's positive response to medication and engagement in therapy suggests they may not be present for a continuous 12 months. Given the absence of mental health treatment prior to 2019, the claimant's reports and performance during the consultative examination, and the short duration of the claimant's symptoms in 2019, the undersigned finds the evidence does not support the presence of severe mental impairments.

. . . .

The undersigned finds the medical opinion of Dr. Mouanoutoua is not persuasive (Ex. 12F). Dr. Mouanoutoua[] asserted that the claimant's mental impairments would preclude the claimant from performing many activities for at least 72 minutes per day and cause him to be absent at least five days per month. He further asserted that these limitations dated back to 2016. The undersigned finds Dr. Mouanoutoua's opinion is not supported by his treatment notes, which show he his treatment history with the claimant does not date back to 2016 and contain limited objective findings. Moreover, his opinion is inconsistent with the fact that the

>claimant did engage in full-time work until late 2017, the claimant's limited reports of stress, the absence of mental health treatment prior to 2019, and the claimant's positive response to medication.

(A.R. 26-27).

While it is true that Dr. Mouanoutoua's notes contain reports of depressive thoughts and symptoms from Plaintiff, they do not contain any results of objective examinations or specific work limitations. Additionally, Dr. Mouanoutoua noted Plaintiff's responsiveness to counseling. (A.R. 436) ("Pt. still appears down, sad, and depressed; yet he is engaged and responds properly to encouragements and feed backs from counseling."). It is also true that Dr. Mouanoutoua opined that Plaintiff's restrictions began in 2016, although Plaintiff was working at that time and had only engaged in monthly counseling with Dr. Mouanoutoua from April through June, 2019. (*See* A.R. 375) ("monthly therapy since 4/11/2019," opinion given 6/21/2019); (A.R. 377) (giving opinion that limitations began in 2016). The ALJ correctly noted this inconsistency between the opinion and treatment notes.

The Court finds that the ALJ's reasons for finding Dr. Mouanoutoua's opinion not persuasive are specific and legitimate and supported by substantial evidence.

### D. Evidence Submitted to Appeals Council

Plaintiff next argues that the Appeals Council ("AC") improperly failed to consider evidence submitted to the AC, which would have rendered the ALJ finding of non-disability based on no severe physical or mental impairment not supported by substantial evidence. (ECF No. 20, at p. 26). Plaintiff argues that the new evidence would change the outcome of the decision.

The governing regulations state that "[t]he Appeals Council will review a case at a party's request or on its own motion if . . .the Appeals Council receives additional evidence that is new, material, and relates to the period on or before the date of the hearing decision, and there is a reasonable probability that the additional evidence would change the outcome of the decision.". 20 C.F.R. § 416.1470(a)(5). According to the Ninth Circuit, "Where the Appeals Council was

required to consider additional evidence, but failed to do so, remand to the ALJ is appropriate so that the ALJ can reconsider its decision in light of the additional evidence." *Taylor v. Commissioner of Social Sec. Admin.*, 659 F.3d 1228, 1233 (9th Cir. 2011).

Plaintiff submitted to the Appeals Counsel a medical source statement from Dr. Thippeswamy, dated January 14, 2020. It stated that Thippeswamy had been treating Plaintiff for nine months for major depression, generalized anxiety, hypertension, and chronic low back pain. It stated that prognosis was "good." It stated that Plaintiff could sit and stand/walk for less than 2 hours total in an 8 hour working day, could stand for 5 minutes at one time, must walk every 10 minutes for 10 minutes each time, could rarely lift less than 10 lbs, would be off-task 25% or more of the day, was incapable of even low stress work, and would be absent from work more than four days per month. Dr. Thippeswamy did not answer the question regarding the earliest day the functional limitations would apply. (A.R. 13-16).

The AC declined to consider the new evidence, stating:

> You submitted a Physical Medical Source Statement from Tejaswi Thippeswamy, M.D. dated January 14, 2020 (4 pages). The Administrative Law Judge decided your case through December 24, 2019. This additional evidence does not relate to the period at issue. Therefore, it does not affect the decision about whether you were disabled beginning on or before December 24, 2019.

(A.R. 2).

The reason given by the AC is incorrect. Dr. Thippeswamy's opinion was based on treatment given in the nine months before the opinion, and thus was related to the period at issue, albeit the end of that period. Thus, the Court looks to whether there is a reasonable probability that the additional evidence would change the outcome of the decision.

The submitted evidence is in a "check-the-box format." It does not cite to any evidence or include any explanation for the limitations given. It also relied on records that were before the ALJ, some of which were discussed in the ALJ's opinion.

According to those records, Plaintiff visited Dr. Thippeswamy on March 18, 2019, to

receive lab results. (A.R. 366). Plaintiff gave a pain score of 0/10. There is no discussion in that record of major depression, generalized anxiety, hypertension, and chronic low back pain. (A.R. 366-368). Plaintiff also visited Dr. Thippeswamy on April 11, 2019. At that time, he was assessed with "[a]cute otitis externa of both ears," "[e]ssential hypertension," and "[s]creening for hyperlipidemia." (A.R. 363). Those notes also do not indicate treatment for major depression, generalized anxiety, or chronic low back pain.

Plaintiff also saw Dr. Thippeswamy on October 11, 2019. That record contains the following relevant notes:

> 2. Depression
> This is a follow up visit. The patient reports functioning as somewhat difficult. The patient presents with depressed mood, difficulty concentrating, difficulty falling asleep, diminished interest or pleasure, excessive worry, feelings of guilt, restlessness and thoughts of death or suicide. Additional information: GAD7: 16 PHQ9: 19.
> HPI: His mood is some what better since taking zoloft and he also seen BHE and he is asking if I have filled his papers requesting for disability as he cannot as he cannot work due to poor vision and blind in the RT eye and also because of his depression.

(A.R. 481). The psychiatric exam revealed normal findings, noting ,"[o]riented to time, place, person and situation Appropriate mood and affect." (A.R. 485). It also stated, "Major depressive disorder, single episode, moderate (F32.l). - mood is better he says but PHQ is still high and will increase the dose of zoloft from 50 mg to 100 mg and will also request referral to telepsych. Referrals: Psychiatry." (A.R. 486).

The ALJ discussed this particular record in her opinion, stating:

> Another medical provider noted that the claimant exhibited an improved mood in October 2019, but since his responses to the Patient Health Questionnaire (PHQ-9) continued to suggest moderate to severe depression, the treating physician increased the claimant's Zoloft dosage (Ex. 20F). While the evidence of record suggests some increased mental health symptoms in 2019, the symptoms have not been present for a continuous 12-month period and the claimant's positive response to medication and engagement in therapy suggests they may not be present for a continuous months. Given the absence of mental health treatment

14

> prior to 2019, the claimant's reports and performance during the consultative examination, and the short duration of the claimant's symptoms in 2019, the undersigned finds the evidence does not support the presence of severe mental impairments.

(A.R. 26-27).

The Court finds there is not a reasonable probability that the additional evidence would change the outcome of the decision. The ALJ reviewed the treatment records underlying this opinion. The newly submitted evidence does not refute the issues raised by the ALJ regarding those notes, including that it only accounts for recent symptoms, shows that Plaintiff is responsive to medication and counseling, and is not based on any objective testing results unlike the consultative examining opinion of Dr. Yadegar.

Moreover, the opinion's limitations appear to go far beyond the information in the treatment notes. It states that it is based in part on Plaintiff's low back pain, which the ALJ did not find to be a medically determinable impairment and is not discussed in treatment notes. Limitations such as standing no more than 5 minutes at a time and needing to walk 10 minutes for 10 minutes each time are similarly not supported by the treatment notes. The medical source statement does not give a basis for these findings.

Thus, although the AC's reason for rejecting the new evidence was in error, the AC was not obligated to accept the evidence under the standards for considering such new evidence.

### E. Physical MDIs

Plaintiff finally argues that there is significant objective and subjective medical evidence of record that Plaintiff suffers from severe physical MDIs at Step Two of the sequential evaluation.

The ALJ found the following physical MDIs: hearing loss, vision loss, sleep apnea, hypertension, and gastroesophageal reflux disease (GERD). (A.R. 22). Nevertheless, the ALJ found that these did not constitute severe impairments. The ALJ explained her decision as follows:

The claimant has reported that he was born with right eye ptosis and has never been able to see out of his right eye (Ex. 5F). The claimant has undergone annual eye examinations, which generally show the claimant's vision is relatively stable (Ex. 6F, 18F, *et al*.). The claimant's subjective reports of symptom associated with his vision abnormalities has varied. At times, the claimant has reported double vision, floaters/spots, flashing lights, and difficulties using a computer. While there have been some variations in the claimant's subjective complaints, the records do not reflect significant changes in the claimant's vision between when he was engaging in substantial gainful activity and when he was not. Moreover, during the hearing, the claimant asserted that even though he cannot see in his right eye, he is able to read well as long as he is wearing glasses (Hearing testimony). The claimant's Function Report also shows the claimant's vision deficit does not prevent him from driving (Ex. 8E). The stability of the claimant's vision abnormality, his ability to work for many years despite his vision loss, and his reported ability to read and drive show the claimant's vision disturbance does not significantly restrict the claimant's functioning. The undersigned finds the claimant's vision loss is a nonsevere impairment.

Similarly, the records show the claimant was diagnosed with sleep apnea in 2014, long before his alleged onset date (Ex. 13F). Records [from] 2014 and 2015 show the claimant did have difficulties adjusting to a CPAP and an oral apparatus (Ex. 1F, 2F, 14F, *et al*.). However, records from 2017 forward do not reflect frequent treatment for sleep apnea, chronic fatigue, or other symptoms that support the presence of continued sleep apnea related symptoms that would more than minimally interfere with the claimant's ability to perform basic work related activities.  Therefore, the undersigned finds the claimant's sleep apnea is also a nonsevere impairment.

In September 2016, the claimant reported that he had been experiencing hearing loss for two and a half years (Ex. 4F/18-33). He was found to have some obstructions in his ears that were adding to his hearing deficits. However, even when the obstructions were removed, which did improve the claimant's hearing, he continued to have some hearing loss. He was fitted with hearing aids. In November 2017, approximately two months after his alleged onset date, the claimant reported that he was happy with his hearing aids and that the hearing aids were working well (Ex. 17F).  He did continue to have some right ear otitis externa, but overall, the objective findings revealed minimal abnormalities. February 2019 examination findings do reveal some changes in the claimant's hearing, but the claimant was still able to understand conversational speech and had frequent understanding of words. An August 2019 evaluation shows the claimant's hearing was stable and unchanged. The evidence of record does support the presence of some hearing loss ,but since the claimant's hearing has improved significantly with the use of hearing aids and now causes minimal limitations, the undersigned finds the claimant's hearing loss is also a nonsevere impairment.

>   The claimant has also been diagnosed with hypertension (Ex. 19F/21-25, 20F). The evidence of record generally shows this condition is treated with medication and does not cause chronic symptoms such as lightheadedness, dizziness, or headaches that would more than minimally interfere with the claimant's ability to perform basic work related activities. Therefore, the undersigned finds the claimant's hypertension is a nonsevere, medically determinable impairment.
>
>   November 2, 2017 records contain a diagnosis of GERD (Ex. 10F/5). However, subsequent records contain limited complaints of or treatment for gastrointestinal abnormalities. Given the lack of ongoing GERD related treatment, the undersigned finds there is sufficient evidence of record to find the claimant's GERD is a medically determinable impairment, but not enough evidence to establish that it is a severe impairment.
>   . . .
>
>   The undersigned finds the medical opinions of A. Khong, MD, and G. Dale, MD, two State Agency reviewing physicians who found the claimant's physical impairments are nonsevere, are also persuasive (Ex. 1A & 3A). Both doctors supported their opinions with a clear explanation as to why the claimant's physical impairments were stable and caused minimal functional limitations. Moreover, the opinions are consistent with the claimant's life-long ability to work despite his vision disturbance, the claimant's stable sleep apnea, hypertension, and GERD, the hearing improvement he has experienced with the use of a hearing aid, and the record as a whole.

(A.R. 24-27).

As the ALJ noted, Plaintiff's medical records were reviewed by two state agency physicians, who found Plaintiff's physical impairments to be nonsevere. (A.R. 59-63) ("**Not Severe** - Impairment or combination of impairments does not significantly limit physical or mental ability to do basic work activities. . . Hearing loss is compensated with hearing aids and vision is 20/60 OD, 20/20 OS. This is a lifelong condition and did not preclude work which required a lot of reading and writing."); (A.R. 73) ("Only new MER is 11/17 audiometry showing nl hearing in relevant frequencies, tells TS [ha]s helped a lot. Review of initial MER shows congenital ptosis R eyelid w resultant poor vision on that side[] but cc VA on L 20/50. After review of evidence P NS provided at initial was appropriate and is affirmed."). The ALJ discussed these opinions and concluded "the opinions are consistent with the claimant's life-long ability to work despite his vision disturbance, the claimant's stable sleep apnea, hypertension, and

GERD, the hearing improvement he has experienced with the use of a hearing aid, and the record as a whole." (A.R. 27).

Plaintiff's brief cites isolated documents regarding all of these conditions, and it appears that there is medical evidence of some level of impairment for these conditions at various points in time, including during his previous employment. For example, Plaintiff cites to the recommendation for surgical intervention regarding Plaintiff's ptosis (upper eyelid drooping over the eye), but does not contest that he was born with this condition and the condition has remained relatively stable. (A.R. 333) ("Mr. Moua presents with his right eye lid shut. He reports it has been that way since childhood."). Plaintiff also cites to records regarding Plaintiff's sleep apnea from 2014, when Plaintiff was still working full time, but does not account for adjustments to a device to assist with it, and lack of recent records showing ongoing issues. (A.R. 268) ("He is having some issues with it and hence he is being referred to a sleep dentist to get a more customized, smaller, dental mandibular advancement device."); (A.R. 380) ("I talked about going with the smallest fully customized dental device made by a sleep dentist.").

Plaintiff also cites to Plaintiff's testimony at the hearing, including that Plaintiff falls asleep every time he reads two or three sentences. (A.R. 48). However, the ALJ found that "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent," and Plaintiff did not challenge that finding. (A.R. 24).

Nevertheless, the impairments to Plaintiff's vision and hearing are supported by objective evidence and do show more than a slight abnormality that has no more than a minimal effect on an individual's ability to work. Plaintiff has little or no vision out of one eye and some limitations to vision from the other eye, although this limitation may be addressed through glasses. While this is a lifelong condition that does not appear to preclude work, at least by itself, it is nevertheless a severe impairment under Step Two of the sequential evaluation. Similarly, Plaintiff has suffered from hearing loss, some of which has been addressed through hearing aids. Again, while it does not appear that this limitation, at least by itself, would preclude employment, it has

more than a minimal effect on Plaintiff's ability to work. The ALJ thus erred in concluding its evaluation of Plaintiff's vision and hearing loss at Step Two of the sequential evaluation.

## II. CONCLUSION AND ORDER

Accordingly, the decision of the Commissioner of the Social Security Administration is REVERSED and REMANDED for further administrative proceedings consistent with this decision. Specifically, the ALJ shall reconsider its determination at Step Two that the medically determinable physical impairments of hearing loss and vision loss are not severe and proceed accordingly with the sequential evaluation regarding those impairments.

The Clerk of the Court is directed to close this case.

IT IS SO ORDERED.

Dated: **February 2, 2022**  /s/ Erica P. Grosjean
UNITED STATES MAGISTRATE JUDGE